JUDGE ROBERTSON
delivered the opinion of the court
(JUDGE HARDIN DISSENTING.)
The terrible ravages of the cholera in the memorable year of 1833 left many infant children in Lexington and the County of Fayette in a helpless state of total orphanage and destitution, dependent on that city and county for shelter and maintenance. Most of them were females, as unfit for a poor-house as it was unbefitting their age and sex. To rescue as many orphans as possible, and train them to usefulness, some benevolent ladies procured a *414 legislative charter incorporating themselves and successors as “the Orphan Society of Lexington/” without any other endowment than voluntary charity. In the year 1834 they organized themselves as a corporate body, under the management of twenty-four of their number as curators, and soon procured a house and ground in the suburbs of the city of Lexington as the seat of their institution, and proceeded to illustrate the beneficence of their noble enterprise, which has ever since admirably succeeded in its aim of comfort, moral culture, and intellectual development. In 1868 the inmates had increased to the number of twenty-five, in nearly equal proportions from the city and county, when, finding their buildings too small for the comfortable accommodation of even that number, and altogether unfit for more who were seeking that asylum, they enlarged and remodeled the structure at a cost exceeding their available contributions by personal charity about two thousand five hundred dollars; and they invoked the aid of the city council of Lexington and of the County Court of Claims of Fayette for supplying the deficit. These authorities responded liberally to that appeal, the city appropriating one thousand dollars and the county one thousand five hundred dollars to the society in its fiducial capacity. From its foundation the city and county had each contributed liberally to the same corporation. But at the instance of the county judge a petition in equity was filed in the Fayette Circuit Court, in the name of that county, for enjoining the payment of any portion of the amount last appropriated by the county court, on the ground of alleged want of jurisdiction to make that contribution. A demurrer to the answer, alleging the foregoing and other facts, was sustained, and thereupon the injunction was perpetuated by the judgment of the court, now to be revised on this appeal.
*415 Under the constitution and authorized enactments of the legislature, while the presiding judge of Fayette is the county court for most purposes, the justices of the peace associated with him constitute the “county court” for levying and appropriating local taxes; and this is therefore the “county court” for fiscal purposes, and in exercising that jurisdiction it acts as the “county court” of Fayette; consequently, if any local authority had power to make the appropriation litigated in this case, the court that made it had that jurisdiction.
It is the interest, as well as the duty, of the commonwealth to take care of the helpless poor who can not take proper care of themselves; and, as parens patrice, she has confided that curative trust to the county courts as her organic representatives.
Article 19, chapter 27, Eevised Statutes, provides that the fiscal county courts, called courts of claims, shall have jurisdiction: first, “to lay and superintend the collection and disbursement of the county levy;” second, “to erect, superintend, and repair all needful public buildings and structures;” third, “to superintend and control the fiscal affairs and property of the county, and to make provision for the maintenance of the poor.” And article 21 provides that “the justices of the peace shall sit with the presiding judge of the court of claims,” and “ constitute the court.” This last provision was prudently conservative.
Chapter 75 of Eevised Statutes authorizes the county courts to buy land not exceeding two hundred acres in each county, and erect poor-houses thereon for the use and support of the poor. The inherent power of the state to provide for the poor is plenary; and the enactment concerning poor-houses is only a partial fulfillment of the trust, and only in one of many various modes adaptable to the effectuation of the object of public charity to one class of *416 her destitute population. The power delegated to the county courts by article 19, chapter 27, is as comprehensive as that of the state herself before the delegation, and might have been executed in various modes without poor-houses. The’chief object of the act authorizing the county courts to purchase land for maintaining poor-houses may be presumed to have been to remove doubt, whether, without Such special legislation, they would have had power to buy and tax the people for such lands. But the mere authority is not compulsive, and could not constructively abolish the power to provide for the poor in other modes.
In many of the counties there is yet no poor-house; and even where, as in Fayette, a poor-house has been provided, it may leave out of its precincts some classes of poor to be provided for in other ways, and who could not be rightly cared for in such society as that of a poorhouse. Foundlings and orphans, with undeveloped characters, are not fit subjects of such a place as the Fayette “poor-house,” organized and managed as it is. It is the public interest to maintain, train, and educate that class of the poor, so as to make them moral and useful citizens, to bless rather than, as ignorant and demoralized nuisances, to curse society.
It is the prominent duty of the county court to provide efficiently for that class. This has not been nor can ever be done by a poor-house, which is a mere refectory and work-house. The erection of a poor-house in Fayette has not either exhausted the powers or fulfilled one half of the value of the trust committed to the county court for the benefit of the poor of all characters and ages. The most interesting and hopeful class are unprovided for in'the poor-house, which only helps to relieve the county of the burden of supporting the most hopeless class. But maintenance and moral improvement of an *417 other class will rescue them from degradation, and by the accession of their cultivated faculties increase the wealth and power of the commonwealth.
The object of the trust confided to the county courts as curators of the poor is two-fold: first, to save from starvation a hopeless and pestilent class of adult poor; and second, to maintain and take care of poor infants, and mold them for the benefit of society as well as for their own welfare. The first cares for the animal, the last more for the moral being. Food, raiment, and shelter furnished by a poor-house supply the physical wants, but the mental and moral require careful tutelage, neither contemplated nor possible in a mere poor-house. To incarcerate an orphan girl of promise, only five years old, in the walls of a “poorhouse,” would be not only a perversion but desecration of the sacred trust to take care of her and rear her to proper womanhood. The guardian care of individual curation and tutelage, or of such an asylum as that of the appellant, is indispensable to the fulfillment of the trust of the county court in all such cases. A poor-house, which is the receptacle of the most degraded poor of all colors, can never fulfill that great trust. There is undoubted power to adapt the means to the end; and as to the class of poor not properly provided for by the poor-house, the County Court of Fayette has all the power to apply the proper means which county courts, where thei’e are no poorhouses, could exercise. The trust is imperative, the power amply commensurate with the end, and the poor-house not fulfilling that entire end, the county court may and must, to some extent, supply the deficit by other and more befitting means, as it has hitherto habitually done.
Why should we doubt that it might organize and sustain an asylum like that of the appellant, where minor oi’phans have been so trained as to be respectable, moral, *418 and useful men and women, instead of degraded wretches as they might otherwise have been? We can see no ground for doubt. And the power to do the whole work involves and necessarily implies the ancillary power to help private charity to secure the same end in a mode far less burdensome to the treasury of the county.
If all classes be consigned to the same institution, the welfare of the minor class would require its segregation from the adult class. Without such seclusion the children could not be properly cared for and elevated to the needful standard of morality and of capacity for useful lives. To assure that contemplated end of amelioration they must be entirely isolated from contact with the deteriorating inmates of the ordinary poor-house, and to secure the end in this way would require a separate and remote house, and cultivated and exemplary tutors at considerable cost, much greater every year than the appropriation for an indefinite duration, which is contested in this case. The children must be not only fed and clothed and sheltered, but to some extent educated. By this small appropriation alone the county may be relieved for many years from this accumulative burden at less cost than the expense of the tutelage alone for only one year.
Then why had not the county court of claims power to adopt this so much cheaper mode of providing for the poor orphans of the county? Possibility of abuse is no argument against the power; but there is no apparent danger of abuse. The limitation on taxation, and the honor, pledges, and responsibility of the lady managers, are alone sufficient guarantees of fidelity in making and applying the appropriation, and especially for assuring the county that the fund will be faithfully applied, as expressly dedicated to the asylum, and if not so applied the managers would be personally responsible for re-imbursement.
*419 While the county court has no authority to give caoay the money of the county, or to appropriate it even, to general charity, it certainly has power to apply it as necessary and proper means to the end of its enjoined duties; and, in so using it, its power is circumscribed only by a sound discretion within the scope of the limited range of taxation. According to this test it might have huilt and maintained the asylum for poor orphans, and consequently might rightfully contribute, as it did, a modicum to aid the institution in extending the building so as to accommodate a larger portion of the poor of the county, and who would not be otherwise cared for as well or at all.
In that way and to that extent it makes the orphan society its agent, which it could do as certainly and lawfully without controlling or participating in the management of the institution; satisfied, as it should be, that the management will be as faithful and beneficent without its control as with it, and contribute as much to the welfare of the poor orphans of the county.
It is therefore the opinion of this court that the appropriation of one thousand five hundred dollars to aid in paying for the enlai-ged house was legal, and that the application of the money to the purpose to which it is dedicated is sufficiently assured; and consequently we adjudge that the circuit court erred in enjoining payment.
Wherefore (Judge Hardin dissenting) the judgment enjoining the payment of the money as appropriated is reversed, and the cause remanded, with instructions to dismiss the petition in the name of the county.